Commissioners at all, argument not to exceed 15 minutes per side. Mr. McGraw, you may proceed for the appellant. Good morning, and may it please the Court, Ryan McGraw on behalf of the appellant, Benita Stewart, I would ask to please reserve 4 minutes of my time for rebuttal. Solutions Community Counseling is the mental health provider for inmates at the Warren County Jail, but it has no written policies or procedures for frontline workers called Boundary Spanners to follow. Solutions offers Boundary Spanners no substantive training on how to perform in their role. Solutions Boundary Spanners are not taught to learn any collateral source information about the inmates they are supposed to be monitoring, or to assess things like mood, affect, and functioning. And when Boundary Spanners are found to be deficient in the field, it does nothing to correct or address these deficiencies. Instead, it's Boundary Spanners believe that they are only required to ask inmates a single question once per week. Do you wish to speak with mental health? How Boundary Spanners perform their duties, though, is in stark contrast to what its former CEO says is supposed to happen. The differences make clear that the need for more Boundary Spanner training is obvious, that Solutions was deliberately indifferent to this need, and that its failures led to Justin Stewart's death. During my time this morning, I wanted to address two specific issues. First, whether a finding of liability against an individual actor is necessary for a finding of liability against Solutions, and second, whether the district court correctly found that Benita could not meet the subjective component of deliberate indifference. We submit that the first issue, the appellees have suggested that liability against Jenny Epling or John Randall is required for liability to attach against Solutions. That simply is incorrect. This court's recent decision in North versus Cuyahoga County makes clear that that's not the case. The act of a municipality, or in this case, private corporations performing traditional state functions, are evaluated and examined on their own. Violations may thus be attributable to municipalities act alone, and not those of its employees. But would you agree, this is Judge Murphy, would you agree that you do have to show a constitutional violation, correct? That you have to show that there was deliberate indifference to serious medical needs, and you don't have to pinpoint it to one individual? Correct, correct. We still do need to meet that deliberate indifference standard, and I believe that we do. Getting to that, I find that the hardest part of your case, it seems to me, is how unexpected the suicide turned out to be. I mean, the deposition testimony from family members suggesting that they were shot. What is the best evidence to put anybody working in the government on notice that there was a serious risk of a suicide? Well, with respect to the family, importantly, none of them are mental health providers trained to recognize the decompensation that Dr. Patterson, our expert, says that Justin was experiencing during those last 15 days of his life. None of them had the ability to interact with him on a daily basis, as the solutions representatives did, and were supposed to. No solutions employee saw these signs of decompensation, though, because they weren't trained to recognize it. The seminal case on subjective components of deliberate indifference is this court's decision in Shadrack. The district court below concluded that the facts in that case had little in common with those here, but we maintain that that analysis was incorrect, and we believe that the facts here are, in some cases, even more egregious. In Shadrack, the inmate came to the jail with physical health problems, and the staff failed to follow written policies at the time of admission or during daily engagement with him. Here, solutions has no written policies for its boundary spanners to follow. They have no daily engagement with inmates despite a jail policy requiring them to, and sometimes they're not even able to meet the weekly standard of engagement. How can solutions possibly be liable in the absence of liability on the part of either Epling or Randall? I mean, how would solutions gain any knowledge at all about Mr. Stewart? We would submit that they are liable because of their failure to train John Randall or Jenny Epling to recognize the signs of decompensation and to recognize that mental health, they have to do more than ask an inmate a single question, do you have mental health needs? And how you make the deliberate indifference, deliberate, I don't know why I'm doing so tangled up with my words this morning, but anyway, how do you meet the standard if you don't have any knowledge of the individual? They don't have any knowledge, again, because their employees aren't trained to recognize it. Solutions knows by virtue of their contract with the jail that inmates are going to come into the jail with mental health problems. In these situations, the Shadrick Court determined that the risk of constitutional violations are created by employees who lack essential knowledge, tools, prep, and authority. Here, Jenny Epling had no prior experience in the jail setting and her training consisted of being verbally told to do rounds once a week to make herself available. That's it. That was the extent of her training. And while the Solutions CEO claims that there are tools to aid her in those assessments, no evidence in the record exists that she used them or even knew about them. There was no oversight by John Randall, Jenny Epling's supervisor, on how to conduct her assessments. And when weakness in those suicidal assessments was noted in her personnel file some 90 days into her employment, there is absolutely no evidence to show that she was provided any additional or remedial training. With respect to Solutions, I would note some similarities in the Shadrick case, again, where the head executive there admitted that the company had no training program and believed that the nurses were trained by virtue of being LPS. Dr. Dern, the CEO at the time of this incident, admits that Solutions, again, has no written policies or protocols and he admits that he has no knowledge about how John Randall oriented his boundary spanners to the job. In fact, he can't even confirm that Jenny Epling received any. Additionally, he notes that if the extent of her training was being told, you need to make yourself available once a week, which Ms. Epling confirms, that would be insufficient. Additionally, one of the things that the Shadrick court discussed in terms of the inadequacy of training is an undocumented policy to only provide services when requested. That's absolutely what we have here. In her deposition, Jenny Epling says that if an inmate says no when asked if they wish to speak with mental health, I have to respect that. That simply cannot be sufficient training in order to ask that single question and move on. Our expert in this case is an extremely well-qualified jail psychologist who opined that the failure to adequately assess Justin's needs, which stemmed from a failure to actually train boundary spanners like Jenny Epling, led to the suicide in this case. Finally, I would note that the disparities in what is required to be evaluated during these assessments between Jenny Epling and Dr. Dern. Again, Jenny Epling's extent of her training is being verbally told to be available. Weekly interactions were not mental health status exams and a single question is sufficient. Dr. Dern, on the other hand, notes that a single question is not sufficient, that during these assessments we should be inquiring into feelings, mood, state, changes to determine if there is a need for a higher level of care, a higher level of supervision, or potentially hospitalization. Additionally, during these assessments, the boundary spanner should be collecting information from jail sources and records to get a full picture of inmate needs. That simply is not what happens in the day-to-day operations of the jail. This is Judge Murphy. How do you respond briefly just to Dr. Barton's mid-August examination? I believe that Justin, at least coming out of that examination, Dr. Barton recorded that there was no suicidal or homicidal ideation. Doesn't that suggest that there at least wasn't a deliberate indifference because this is not a case where they completely denied medical care or psychological care. It's a case where a doctor did examine the individual a few weeks before and reached that conclusion. Yeah, and it's that last point, Your Honor, that I think is important, that that assessment was done on roughly two weeks before Justin died. And no one saw Justin in those last two weeks, which Dr. Patterson described in his report as when Justin was decompensating significantly as evidenced by his withdrawal from activities and meals. Actions with which Jenny Epling acknowledges are indicative of suicidal risk. The references, though, and the underlying mental health problems Dr. Patterson confirms should have resulted in a multiple disciplinary team being established with daily interactions. Your time has expired. May it please the Court, Robert Hanoski with the Reminger Law Firm on behalf of defendants and current Epley's Solutions Community Counseling and Recovery Centers, Jenny Epling and John Randall. I would note for the record, Your Honors, that John Randall has recently passed away unexpectedly. So his state has not been substituted, but he passed away during the pendency of this appeal. I do have the privilege of representing Solutions and Ms. Epling. Solutions is a well-reputed community-based mental health organization, and relative to this case, by contract, they provide discrete mental health services at the Warren County Jail. At the time in question, they essentially provided two full-time mental health counselors who were there for the needs of the inmates at the jail. Ms. Epling, it's suggested she wasn't properly trained or didn't have the requisite experience, but it is glossed over the fact that she has a bachelor's degree in criminal justice, a master's degree in Ohio, an independent dependency counselor. She had prior counseling and mental health experience before coming to work at the jail. She had worked at the jail in Warren County for approximately two years before Justin Stewart's death. She generally would work Monday through Friday, 8.30 in the morning to 5.00 in the afternoon. She did a variety of things there. She did 12-day mental health screenings of all inmates. She was responsible for inmates on suicide watch, monitoring that, putting them on it, taking them off. She checked in weekly with her supervisor, John Randall. They would meet at least once a week to review the various inmates that were there and the needs that were needed. If any inmate had an active plan of care in the jail and was cooperative, she would provide counseling. This record is certainly well-established that Justin Stewart at no time during his roughly three-and-a-half months at the jail requested mental health services. He never requested services through a guard, through any interaction with Ms. Epling, through any interaction with Dr. Barton, through any interaction with John Randall. There was a kiosk system in his pod at all times where he could request services. In his communications with his family members, telephonically, he never requested any services. He was sent to Summit Behavioral Hospital for a 20-day inpatient competency evaluation. That was in June. He came out of Summit without any diagnoses, without any recommended treatment, without any medications. He was requested, in connection with his underlying criminal case, to be evaluated for potential involuntary admission. As is noted in the record, that's when John Randall saw him, talked to him for roughly an hour on August 12 of 2016. Mr. Randall, in his deposition, explained that Justin was cooperative, that he looked physically healthy, that he was forward-thinking, that he was talking about wanting to get out of the jail and to get a job and resume his life. He was in the jail due to an underlying family dispute with his father over a family business and some related property damage and associated things that were occurring with the family business. But he was forward-thinking with Mr. Randall. Three days after Mr. Randall saw him, as was just noted in questioning the counsel, he was seen and evaluated by Dr. Barton, who's no longer a party to this case, was voluntarily dismissed. Dr. Barton testified that he did not believe that Justin had any mental health needs at that point in time, that he wasn't suicidal, that he wasn't a risk to himself. Backing up even earlier than that, again, in connection with his underlying criminal matter, Judge Peeler of Warren County had requested a psychological evaluation of Justin that was conducted by Dr. Marciani between roughly July 5 and July 26 of 2016. She issued an extended report that is of record, and of note, she did not indicate in any way that he was suicidal, that he should be placed on suicide watch, or that he was a harm to himself in any way. He spoke to his parents and uncle the day before his death, and literally within hours of his death, his parents have uniformly testified that there was no indication from those phone calls that he was in crisis, that he was, and made any indication of harming himself, or that he needed to see anybody or be evaluated. And as was noted, his death was described as a complete shock. John Randall saw Justin two times, as he described in his deposition, once early on after his admission to the jail for purposes of trying to get him to cooperate with being screened. He was initially uncooperative with being screened medically and through mental health, and as the record indicates from all the testimony, he generally would tell everybody from medical or mental health that he was fine, that he didn't need anything, and that was his right to do. Before he came into the jail, in Warren County Jail, and over his roughly 29 years of life, he had no prior history of mental health needs or issues, no prior treatment, no prior suicide attempts, no family history of suicide attempts, no indication of self-harm anywhere in his background whatsoever. This court has reviewed multiple jail and prison suicide cases over the years, generally under Section 1983, of course, and there are replete cases that have come before this court where there are far more egregious facts, where there actually is some evidence that an inmate is in crisis, that an inmate has had prior suicide attempts, that an inmate has asked to be seen by mental health, has asked for treatment, and often those cases, the material issue of fact is whether or not mental health responded to those needs or if they just ignored the person. Can I ask you a question about the, this is Judge Murphy, can I briefly ask a question about the objective? I'm trying to figure out the level of generality at which we should define the serious need. Here I think it was obvious that he had a serious need of mental health concerns and that's why he was treated several times. Do you think that the level of generality for the objective portion of the test should be something lower like a serious need of suicide intervention? Well, certainly. I mean, it has to be a serious medical need and in this case, despite, and there's even more times where he was evaluated before he came into the jail, but when he came out of Summit, he didn't have a diagnosis. The only medical, mental health provider that provided him with a diagnosis was Dr. Marciani, who indicated that he had some anger issues, but no indication that he was at risk for self-harm. So that's the question. So you would agree though, wouldn't you, that he had an objectively serious need for mental health intervention, but the question is, should that be enough to satisfy the objective standard or should you have to show an objective need for, I guess, suicide watch or suicide intervention? In all the suicide cases that have come before this court, other federal courts over the years, there has to be an objective indication that there is suicidality, that the inmate is of a serious risk of committing self-harm. I mean, there's a thousand different mental health diagnoses that one could have. It certainly does not mean that they are suicidal or at risk for self-harm. Justin Stewart was never placed on suicide watch. He was seen over his three and a half months roughly in the jail, other than the time at Summit, almost on an hourly basis, if not more, by correction officers and by guards. There was testimony from Sergeant Richardson and Georgetta Sims in this case, and the evidence is that there was no indication from any guard at any point in time that he was ever at risk for harming himself. There was no suicide note left after the fact. In a lot of these cases, there's a record history of what is sometimes generally referred to as KITES, which are inmate requests for either medical or mental health services. There's no indication of a KITE in this case of any kind. There was certainly efforts being made to determine if there was something going on with him, if there was something that was explaining his behaviors and why he damaged property at his parents' house and why he was in a dispute with his parents. He was incarcerated during this stretch of time, this three and a half month period of time from a probation violation, because he wasn't following through with doing some of the things that the criminal court had imposed on him for his prior charges. To answer your question and to come full circle on that, in all of the 1983 jail suicide cases, there has to be indication that the inmate, in the languages, has a strong likelihood of committing suicide. That most certainly cannot be said in this case. We would submit that the material dispositive facts in this case are uncontroverted. When we briefed summary judgment in front of Judge Gillotte, she demands that her standing order is that we submit proposed undisputed facts to which plaintiff's counsel indicated which facts they agreed with and which facts they didn't agree with. They largely stipulated to the key facts and the timeline given rise through his period of time there. It was indicated that he was not seen after Dr. Barton last evaluated him, and that's not true. He was seen by Jenny Epling on August 22 of 2016. As described in her testimony, she would do administrative segregation checks, meaning there's a pod at the Warren County Jail where there's inmates that are in their own cell. They're single cell inmates. They're allowed out for recreational time, and there's some general area in there. And she would, of course, have to be accompanied by a guard. She's not allowed to go into a pod or into a cell on her own. She doesn't have keys or access to do that. And so she would go with a guard into that pod on roughly a weekly basis and check on the inmates, essentially, ask them how they were doing, if they needed anything. And repeatedly, whenever she interfaced with Justice Stewart, he would indicate, I'm fine, I don't need anything. And the essence of the case seems to be that someone from my client, either Mr. Randall or Ms. Epling, should have forced Justice Stewart to talk more or to somehow submit to counseling, and that that would have ultimately affected his decision that he made on the afternoon hours of August 30, 2016. Justice Stewart had a right to deny treatment of any kind, notwithstanding the fact that there was no indication that he needed any counseling or treatment for any risk of self-harm. And again, I know that there was a finding by Judge Gillotte that she thought there was enough evidence to satisfy the fact that he had a sufficiently serious mental health diagnosis, but the only mental health provider that even determined he had any issue whatsoever was Dr. Marciani, who recommended outpatient treatment. Arrangements were being made that he was going to be released, he was going to live with his uncle, Mr. Oswald, who testified and who spoke with him like his parents within several hours of his death. Mr. Oswald was going to accept him in his home. Justin had previously lived with him. Mr. Oswald testified that he never, all of the time that he ever interacted with Justin or talked to him on the phone, including the hours before this incident, that he thought that he was in crisis or at risk for self-harm. And there were going to be arrangements for Justin to seek outpatient counseling as part of his community control terms when he was released, which was forthcoming. And again, he was forward-thinking. His parents indicated that he was forward-thinking. He had a separate civil lawsuit that he was involved with at the time and was representing himself in Claremont County, where he would have communications with a trial judge there and pleadings that he would file. And again, I know a lot of the argument, at least on appeal, relates to supervision, training, policies. I discussed some of Ms. Epling's background in that regard. It's also of note that John Randall had a bachelor's in counseling, a master's in education. He was a licensed professional clinical counselor with a supervisory designation. He had decades of counseling and mental health experience. For roughly two years before this incident, he was the coordinator for crisis services for solutions, meaning that he was in charge of roughly 10 to 12 mental health employees for solutions that would do mobile crisis evaluations, pink slip evaluations. He was essentially in charge for determining whether or not someone met the criteria for involuntary hospitalization. He was certainly highly experienced in that regard. He indicated that he conducted a 90-day review of Ms. Epling, that he met with her weekly, that she shadowed him when she started. Both Ms. Epling and Mr. Randall were highly trained and experienced in the fields of mental health. Most certainly, they did not violate Mr. Stewart's constitutional rights without a constitutional violation by one or of them. There can be no model claim against solutions for any custom policy or procedure. There's no indication of any other suicides at the Warren County Jail, no other indication that solutions had defunct policies that were leading to repeated incidents of self-harm by inmates. There's no indication whatsoever of that in this case. In closing, Your Honors, I would submit that of literally all of the jail suicide cases that this court has reviewed, that this case has the least amount of evidence or factual support that would allow this case to go forward in any way, and we would respectfully ask that the district court's decision granting summary judgment as to the federal claims be affirmed. Thank you. Time has expired. In my rebuttal time, I'd like to address just a couple of issues with respect to training. Importantly, none of the training which Jenny Epling received is related to her role as a boundary spanner. She described health trained officer, she was trained as a health officer. That's just how to involuntarily hold people. She was trained on how to maintain health records. That's not what she was performing in her weekly assessments. None of the training that she received was related to her role as a boundary spanner. In her deposition on page 598 of the record, the extent of her training with respect to that role is discussed. John Randall verbally told me to do rounds once a week to make myself available. Anything else? No. That was the extent of his training? Yes. Next, there was suggestion that the only medical provider who ever diagnosed Justin was Dr. Marciani, and that's not correct. When he was released from summit, he was diagnosed with narcissistic personality disorder. Dr. Marciani later diagnosed him with delusional disorder, persecutory type. But importantly, Jenny Epling, who is the frontline provider, had no knowledge of those. In fact, it was her practice not to review any collateral source information. Here, in the last two weeks of Justin's life, we've got an inmate with a serious and chronic mental illness who is seldom leaving his cell, who is skipping meals, and the only thing he was asked, the only thing he was asked was, do you wish to speak with mental health? As Dr. Patterson has testified or has opined in his report, suicide is a perceivable and well-known possible consequence of psychological neglect in the jail setting. That's why the county and solutions have checklists for suicide prevention. While it's not inevitable that suicide will follow, it's certainly not unusual. Here, solutions essentially made it a point to have their frontline providers learn as little as possible about the individuals that they were monitoring. That simply cannot be acceptable from a mental health provider. The facts viewed in the light most favorable to Bonita show that solutions took no steps to train or supervise its boundary spanners concerning the constitutional dimensions of mental health care in a jail environment. Dr. Patterson rightly opines that this failure to train and supervise led to Justin's death. A reasonable jury could find that solutions failure resulted from its delivery. We believe that summary judgment was therefore inappropriate, and unless the court has any other questions, we would ask you to reverse the district court's order of entry and remand the case for further proceedings. We appreciate the argument both of you have given and will consider the case carefully. Thank you. Thank you very much.